I wonder if the attorneys on the second case would step up and identify yourselves for the record, those of you who are going to argue. Counsel, you have 15 minutes to address the court and you may save out from that 15 any portion you wish for a response. Your name again? My name is Adrian Vukovich, Your Honor. Mr. Vukovich, thank you. I would think to save two to three minutes for reply. Very well. May it please the court, once again, Adrian Vukovich representing the Apollons and Crossapolis third party defendants in the trial. This case started out with you folks, somebody suing the other side. It started out with an entity called American Realty Corporation suing Mr. Blonstein. Can you figure out along the line how many corporations are involved in this case? I don't know. You don't know? I don't know that I counted, but many. These were all individual corporations? They were all individual corporations with their own legal entity, Your Honor. So there was a plaintiff, there was a substitute plaintiff. How did it happen that the third party defendants, what legal basis did they have for assuming responsibility for these three leases in Tennessee? Assuming them as to the lessees, Your Honor? Weren't there agreements entered into between the people in Tennessee and the corporation of the original plaintiff in this case who died? There were three leases, two in Tennessee and one in Virginia. Okay. And those leases were with corporations which were owned by Salvatore DiMucci or some trust in which he had an interest. Wasn't there some testimony, though, that his brother, the successor in this case, the third party defendant, was also a party to those corporations? He was on the board of directors of one of them? There was testimony. First of all, I'll correct your word successor because Mr. Blonstein asserted a claim of successor liability in the case. I understand that. It was rejected by the trial court. I understand that. I'm just clarifying, Your Honor. Yeah. There was testimony that Anthony DiMucci had filed an annual report with the Illinois Secretary of State in 1997 regarding the corporation. And then the testimony from both… Somebody said that was inherent. The lawyer who prepared the annual report, Jerry Biederman from Neil Gerber and Eisenberg and Anthony DiMucci, both testified that that was inherent. That he was never an officer of that corporation or a director? Or an owner. Or an owner. Yes, sir. And more other evidence in the case was that in prior annual reports, 1996, the year just prior, that that report, also prepared by Mr. Biederman's law firm, showed that Anthony DiMucci was not an officer, director, or owner of the corporation. Even though the Secretary of State's information indicated that he was? The 96 did not say that he was. The 97 was the error. All right. So that's what happened. And as to – that was, by the way, not refuted, the testimony of Mr. Biederman or Mr. DiMucci, nor did the trial court make any finding that that testimony, that there was a mistake, that it was not credible. And I would suggest, Your Honor… On their cross appeal, did the Bronstein's ever – did they ever appeal the ruling with respect to successor liability? No. As I understand it, the cross appeal is confined to the damages calculation of the trial court. Right. Okay. To go back to the prior point on the mistake, I think that any time a lawyer admits to making a mistake, it's an unusual circumstance. It should be taken as valid. It should be taken as true. And the trial court took it as true. I'm not so sure that we'd go along with that. Well, there was no indication that it did. So what you have here is Mr. Bronstein, who for his adult life was a licensed real estate salesperson. He signs a contract with a corporation called DiMucci Realty Ltd. in 1996. He resigns in June 1997. And during that time period of September through June 1997, he, under his own testimony, produces these transactions. Well, let me ask you this. Were the leases in place at the time that he resigned? My understanding, I think, is that the… There were three leases in place. There were three leases. I'm reasonably confident two were signed and probably three by the time… And these were the leases that eventually became the Hamill Property Partnership, the Tennessee Valley Corporation, or they were part of those corporations, were they not? These leases were eventually subsumed or whatever you want to call it. They were assigned to these corporations. How? These leases eventually became the basis for the relationship between the third-party defendants and CVS. But how did that come about? How did they get there? Were there any documents admitted into evidence at this trial with respect to how Hamill Property Partnership, Tennessee Venture Corporation, Hamilton Road Property, Lynchburg Development, how those corporations, which are, I take it, the corporations by the surviving brother. They are. How they came to actually succeed to what was originally something that the deceased brother developed. They're not successors, so I'm going to correct that. They're not successors. No, but to answer your question, the testimony at trial was that the shareholder of the corporations or entities which held the leases, the deceased brother's corporation, his widow, Sal is the father and Yvonne is the wife, they did not want these transactions and decided not to do that. And subsequently, subsequently, the other brother formed the entities and did the deals. How? So the deal wasn't completed? How did the leases get from one party to the other? They just used them. They used the leases. This is where things get very foggy, even when I look at the record and when I look at the briefs that both parties have submitted. How the succeeding brother became the principal in these leases that originally had been involved, that involved development anyway, had been undertaken by his deceased brother. How he succeeded to that position. He decided to do a transaction which had not been done. The real estate for these three CVS stores was not purchased in July 1997 when the one brother died. What did the leases provide for? Just give us that in a nutshell. The leases provided for the construction of a CVS pharmacy and for lease terms per square foot. So basically, was CVS leasing these properties from the corporations after they were built? Yes. All right. So those leases were all in place at the time that Sal died. Well, I agree. The leases were signed. But there was no... Who was liable in here in Illinois on those leases? Whatever was the contracting... Sal's Corporation. Yes, sir. Sal's Corporation. Yes, sir. The brother who died. Yes, sir. They were liable on the original leases. They were. And on those leases, they agreed to build and construct these properties, and in return, they would eventually be the lessor and receive rent receipts from the CVS. Is that what the basic... No, I think, Judge, any time I think you have a lease with no real estate purchased, that lease is subject to a purchase by the lessor. Whatever. It was a contractual arrangement. It was a contractual relationship. Okay. Now, how did the surviving brother get involved? You say he wasn't a successor. He was not a successor. The corporations that he formed were not successor corporations. Correct. They were what? They were new entities. New entities. But how did they get title to what was owned by the corporations that Sal had formed? The corporations which Sal had formed only had a lease. They did not own real estate. After Sal died, his widow determined she did not want to do the deals. So it's like any business deal. Does CVS want to continue with the deal and do a store? So the brother, the third-party defendants, decided, I'll do it. You don't want it? I'll do it. I'll put my money in. I'll form corporations. I'll buy the real estate. And like any lease, you can't have a lease until you have real estate. So that's what he did. Well, was there any consideration for the assignment of these leases? Not that I'm aware of. The testimony in the record was that the widow did not want the transaction. So I don't even understand. Why was there any necessity for a lease assignment if it was virtually not wanted? Why wasn't a whole new transaction completed? I think it was just convenience. I mean, it's a deal that got started that didn't happen, and the person who started the deal didn't want to do it, and then another person came along and said, I'll make the deal. That is not an issue, really, in this case. That's a question the CVS objected. Well, the question is whether Mr. Blonstein did anything to get those leases in place that were eventually used by these new corporations to complete the deal that the widow didn't want. I mean, that is one of the issues here. That's one of the issues. But, look, let's say he did. Let's say he procured three leases. That was his testimony. Let's go back to the trial judge's finding, which is that that's what you're appealing, and I'm looking at paragraph 13 of Judge Winkler's order. Okay? Yes. It's at page A3 in your appendix. Yes, sir. After Sal's death, Tony, that is the current third-party defendant, right? Am I right? That's one of the third parties. Well, I mean, one of them. Yeah, right. I mean, considered the Hamill, Brainerd, and Lynchburg deals to be a gift horse and, as a result, caused the defendants to obtain from the entities as an assignee or transferee without consideration all of their rights to develop the Hamill, Brainerd, and Lynchburg deals under the leases and purchase agreements. Now, nobody's appealed that finding, have they? Well, we've appealed the order. You've appealed the order. Okay, and so, wait, wait. So we've appealed the order. And so if the issue is is there consideration for these leases, that's not an issue for this case. That is not an issue for this case. The testimony is that the original lessor did not. I don't see how unjust enrichment gets in here. If you're legally the successor as an assignee or transferee of the original, this may be in your favor, really, what I'm suggesting to you. It is, because there is no evidence that the third party. But you may be liable in contrary. Well, that's not what the court found. In fact, the court expressly, this is the problem with this order, that this order is so contradictory that it is illogical. On the one hand, the court finds that the contract between Mr. Blonstein and Demucci Realty Ltd. does not apply. And yet, repeatedly, both in the liability order and the damages order, the trial court goes back to the contract as a basis for liability. It makes no sense. If we're going to have an unjust enrichment claim, which is the only claim that Mr. Blonstein's estate prevailed on, then the contract is out the window. Yet, from the order that's the basis for liability never stops talking about the contract. Paragraph three, the agreement, the contract, set in motion the actions of Blonstein that gave rise to this court's finding that he is entitled to compensation. It makes no sense. He rejected success for liability, correctly so. Why? Because that was the evidence. There was no evidence that there was a common shareholder, common officer between whatever the original parties were on the leases, or more importantly, Demucci Realty Ltd. That's the entity that had the contract with Blonstein and the third-party defendants. That's where we need to focus because that is the party with whom Blonstein had the contract. And so you have that absolutely contradictory determination by the court that the contract doesn't apply in paragraph three, paragraph five, seven, nine, 13. He all goes back to the contract. And as far as I could tell, the law in Illinois has not changed, that if there's an express contract, you cannot have a claim for unjust enrichment. Well, that's generally true. Well, I'm not aware of any exception to that, Your Honor. And the contract is then out the window. But that's not what the trial court did. The trial court said expressly that the contract is the basis for the cause of action for unjust enrichment, paragraph three. Even went on to use the contract and supposed compliance with the contract as a basis for liability, paragraph nine. Because Blonstein substantially performed all material duties that he was required to perform under the agreement, he is entitled to be compensated based upon unjust enrichment. Makes no sense. Absolutely no sense. Now we get back to the issue of what was Blonstein. Blonstein was a real estate broker, and therefore he's not entitled to anything. Well, there was a real estate broker in place for these properties, was there not? Yes. And didn't the agreement that Blonstein signed, it called him something other than a broker, didn't it? No, actually it did not. He anointed himself this development. He gave himself a title. Well, what did the agreement say? Development director. Yes, director of development. All right. What did the agreement say? The agreement said that. I'm sorry for interrupting you, but didn't it allow him to purchase part of these properties that were developed? It gave him the right to put in a capital contribution to pay it and therefore get a 10% interest in these deals. But that does not go to the issue of what was he. You ask me what does the contract say? But a typical real estate broker doesn't get that kind of a deal. Does he or she? It depends. If you look under the broker statute, which we cited in our brief, there are different kinds of compensation for brokers. A broker can get paid in any way he wants in whatever is negotiated. The typical way, of course, for a broker to get paid that we're all familiar with is commissions. And so you go to this contract, paragraph one. It talks about what Blonstein's duties were. To identify, develop, and present to the company potential transactions involving the lease, sale, development, redevelopment, or exploitation of real estate. You go to another page. How is he to be compensated? Commissions. Now, under the Illinois statute regarding brokers, which we cited, it says exactly that. What is a broker? A broker is anyone who directly or indirectly negotiates, produces a transaction for the sale, lease, purchase of real estate. That's exactly what Blonstein did. That's exactly what he said he did. He admitted in his evidence deposition that he acted as a real estate broker. There's no doubt he was licensed to be a real estate salesperson in Illinois. But that doesn't matter. What we have here are three transactions, two in Tennessee, one in Virginia. Wasn't there a Tennessee broker involved at some point? There was. Fine. Then co-broke with him. That's the case that Mr. Blonstein cited in his brief. If you have a co-broker deal with someone, okay. But he didn't. There's no evidence that that occurred, and it didn't occur. And so what you have is a person seeking payment for producing real estate transactions, being a broker, in Tennessee and Virginia. Wasn't there a testimony, though, from someone in Tennessee, a woman who said that Blonstein had made several trips there for the development of these leases? Kathy Evans testified. She had been a person who worked for CVS. I don't recall if she still does. She said that she met Mr. Blonstein having to do with the CVS stores in Tennessee. It doesn't matter as to the illegality argument. He is not entitled to any compensation. Did Winkler, Judge Winkler, determine, and doesn't the contract provide for choice of law in Illinois? Number one, Judge Winkler said the contract doesn't apply. Number two, right? Number two, if we're going to have unjust enrichment, the contract doesn't apply. What Judge Winkler did was he didn't, with all due respect, he didn't address the issue directly. He just said under paragraph four, when rendering services under the agreement, which he said doesn't apply in Tennessee and Virginia, Blonstein was not working as a real estate broker. He didn't say what he was doing. And Blonstein Are we reviewing that finding about whether he was a broker, acting as a broker? Yes. No. We've asserted that that is a question of law. Because we're interpreting a statute. Whether you're interpreting the Illinois broker statute or the statutes of Tennessee and Virginia concerning what is a broker, that's a question of law. Even if you want to go to the facts, you have the admission of Mr. Blonstein that he was acting as a broker. And that to me negates any right to compensation under any theory whatsoever out the window. Now, back to the unjust enrichment claim. Besides the fact that the court repeatedly relied on the contract as a basis for its finding of liability and damages, contrary to the law, there was no right to any unjust enrichment claim because of this. Is that we cited in the briefs in this argument between Did you establish that there was some kind of a contractual arrangement between your client and his deceased brother with respect to the successor? Let's strike the word successor. I know you don't like that. The corporations that Tony formed in order to complete these deals. Did you assert any kind of a contractual arrangement between Sal's corporations and Tony's successor or new corporations that took over the deal? We proved that the decedent's widow did not want the deals. Okay. Now, that's all we needed to do. It doesn't, because look. I understand your position. I understand your position. You're a lawyer. From a legal point of view, you don't want to be a successor corporation. No. Because then they just might have a cause of action against the successor corporations. Correct. Okay. But beyond the fact that I don't want there to be a successor, because what lawyer really does normally, except a plaintiff's lawyer, there isn't a basis to be a successor. Okay. And then what's wrong with their unjust enrichment claim? Aside from the fact that he's a real estate broker. Let's set that one aside. That's a separate issue. You have to have a relationship between the plaintiff who's claiming damages in an unjust enrichment claim and the defendant, or in this case third-party defendants. There must be some relationship. How about tortious interference with contractual arrangements? Not alleged. Never pled. I know. Not alleged. Not found. I know. No fraud found. And whether it's HPI or the McKay case, or even the more recent case of Marcus, says you must have an underlying basis for unjust enrichment. You can't just say unjust enrichment. You've got to have fraud. You've got to have something. Now, here they sought to amend their third-party complaint, second-amended third-party complaint, at trial to include fraud, to include claims of fraudulent conveyance. The judge didn't buy it, denied those claims. That's not the subject of the cross-appeal. Now, the Marcus case says there must be a duty, must be a duty owed by the defendant to the plaintiff in an unjust enrichment case. The testimony here is that Mr. Blonstein never once spoke to Anthony DiMucci about these transactions until long after he resigned. So, in fact, he did nothing, by his own admission, in reliance upon anything with the third-party defendants. They didn't even exist. He didn't work for them. He never talked to them. He didn't do a thing in his life in reliance upon anything said or done by the third-party defendants, which only makes sense, because they had nothing to do with the transaction until after he quit, after the brother died, and until after the sister-in-law said, I don't want the transactions. And none of that was refuted. Most of that is the admissions of Mr. Blonstein. Okay. One more point on that, and then I'll hit damages quickly. In the Paradise case versus Augustana, it says reliance is part of the claim for unjust enrichment. It couldn't be reliance, and Blonstein, by his own admission, says, I never did anything in reliance upon third-party defendants. Now, on the damages claim, I don't know how the judge really came up with his damage claim, other than he took the highest and lowest numbers and decided to come out with a number. And I think that if you look at the two cases that we cite, or three cases, Champaign County versus Hanks being the best one, is that in this kind of case, the measure of damages is the reasonable value of services conferred by Mr. Blonstein. And we had an expert at trial testify about that. And the maximum recovery under any theory, any quantification of reasonable value of services, was about $125,000. But we haven't even gotten to the amount of money which Blonstein received and which the trial court refused to consider another error as far as we're concerned. So in this case, it's really no different than any other case where there's a broker or somebody like in that position. Blonstein claims he did some work. He says he didn't get paid. And this case is to get paid. Our problem is we shouldn't have to pay him a thing, one. Two, he has no right to it under illegality. And three, even if he is entitled or was entitled to some compensation, it is limited to the value of the services which he performed. And then you have to take into account what he received and didn't pay back. By his own admission, it was either $268,000. Didn't the court strike that for re-defense? Yes, ma'am. And then you didn't stand on it. How can that be appealed now? The court struck the affirmative defense at trial, and we are appealing the trial court's order, the trial court's finding of liability, and that is all of these interlocutory orders are included in the judgment orders. And that's your striking of your affirmative claim to the money that you say he owed. Yes. I don't see how that's before this court. We are appealing the trial court's two judgment orders. Within the judgment orders, within the arguments at trial, I raise the set-off defense, if that's what you want to call it, or whether you call it a set-off or the fact that the court must consider that money which Blonstein received and did not pay back in its damage calculation. So if it's a set-off, it's an affirmative defense. But it doesn't have to be a set-off. It must be considered in the damage calculation because you have a person saying, I didn't get paid for procuring these real estate transactions, yet the fact of the matter is by his own admission. But you remember you're not a successor, right? That's right. So I don't understand how. I don't know what you are. I don't know how you can succeed. It's a new entity. I understand that part. I don't know how you can succeed to these claims that he owed DiMucci money when you're not claiming that you've succeeded to any of this. Okay. That's a good point. I mean, I think that's essentially what the judge must have determined. How can you succeed to this when you're saying you're not a successor at all? But that determination doesn't make sense because in the liability order, the court, without a proper basis, I believe, found that the third-party defendants were, in fact, some kind of successor or related entity. He uses that language himself. He does. And yet when we get to the damages, having found that there's a relationship between the parties on the liability order, he said, oh, no, you can't assert the set-off because you're not a related party. The assignment's bad. Well, that makes no sense, number one. Number two, the assignment, I thought, was there was sufficient evidence of the assignment. I don't think the court followed the assignment correctly because it went from the DiMucci realty LTD entity to another entity, and then it went out. So it was that first assignment which got attacked in the trial court, and that was a written assignment, and the party who executed the assignment was not my client. It was the corporate attorney for DiMucci Realty LTD. Did anybody from the lessorist testify in this case? You mean the original lessorist? No. We have to give your opponent an opportunity to respond. You should. We'll give you an opportunity to reply. Counsel, your name again is? Arthur Rosenson. What's your best case for unjust enrichment? Have you got an analogous case? Oh, what, case law? Yeah. You can't just pick unjust enrichment out of the air. You have to have a foundation for it. Correct. And your best case is? As far as the legal principles, the Supreme Court decision in HPI. Okay. I want to back up a step. Just so it's clear, as I've introduced beforehand, my client, Carol Blonstein, is here on behalf of the estate. I was before this court approximately five years ago, the first time that it was heard by this panel. It's not this panel. I was on the panel that heard the first case. Right. We didn't actually get to oral argument because there was a little problem. The predecessor counsel and third-party defendants didn't appear, but I thought it was this panel based on the names and the opinion. But in any event, at that point in time. That case is strictly a statute of limitation. That is correct. Correct. Had nothing to do with the underlying substance of the case. That is exactly correct. We're here now to – I want to address certain of the main issues that the court presented. Not exactly what I wanted to present. I still want to know what your best case is for an unjust enrichment theory.  Is that the HPI healthcare versus Mount Vernon? Correct. And what were the facts in that case? The facts are not analogous. I know they're not, but why don't you tell me what they were so then you can tell me why the case is analogous. HPI set forth that the state cause of action based on unjust enrichment plaintiff must allege that the defendant has unjustly retained the benefit to the plaintiff's detriment and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. Was there a contract in that case? I'm not aware of it. I think there was. But the point that I – if I may proceed. I will get to the point, but I am not able to cite the case that's factually analogous, but it's right with unjust enrichment. This court stated in this panel in 18 Investments versus Nation's Credit, 2007, a cause of action based upon unjust enrichment does not require fault or illegality on the part of the defendants. If I have a contract with you. Excuse me? If I have a contract with you and you agree to pay me for doing some work for you. Correct. Okay. And you're a corporation. Yes. And I go ahead and do the work. Yes. And then you die. But the corporation remains. Yes. Okay. But the successor in charge of the corporation decides that the particular underlying agreement that led to you owing me some money for developing it, that they're no longer interested. And they just abandoned it. That's their statement. They abandoned it. That's never been rebutted in this case, has it? That the – well, maybe it has. Maybe it hasn't. But let's assume for the time being that it has not rebutted, that the original corporation to which I entered into an agreement with you and I decides not to pursue the deal after one of the principals in the corporation dies. Okay? They just left. And somebody else comes along and picks up the threat. Nobody objects to them doing it, including the people that originally had contracted with the man who died. Do I have a cause of action against them in contract? How was the threat picked up? Was it done through – I don't know. That's what puzzles me about this whole case. I will give an answer to the question. You people read this case to how many years? I can answer the court's concern. I wasn't given the opportunity. All right. Okay. Let's take an example, Lynchburg Development Corporation. I will walk the court through what happened. Lynchburg Development Corporation. That's the successor. Forget successor because that's been shown not to be the case. They're not successor corporations. We're dealing with the Lynchburg entity. The Lynchburg entity. Defendant's Exhibit 20 is the lease signed April 1997. April 1997. Sam is alive while the agreement's in effect. Right. Signed by sales entity, Demucci, Development Corporation of Lynchburg. Okay. Solid gold, worth $5 to $10 million. Now, is Tony involved in that? He is not involved. However, in 1997, after Sam dies, Defendant's Exhibit 44, Tony signs Secretary of State Annual Report 4. Fine. Then you've got a call of action based on contract. No, no, no. I will explain because please. Go ahead. I can explain. I'm willing to hear the explanation. He signs the annual report. He states on the stand, this was a mistake. Although I said I was the president, I really wasn't the president. My brother was the president of this entity. He was dead. This was an error. Two months later, Defendant's Exhibit 47, February 1998. Assignment of lease from Demucci Development Corporation of Lynchburg, the original party, to third-party defendant, Lynchburg Development Corporation. Signed in both signature blocks by Anthony Demucci, who had no capacity to sign it, which is why Judge Winkler said to have successor liability, you must have continuity of shareholder ownership, directors and officers. It doesn't matter that Tony Demucci was signing the annual reports. This was a lie. This was a mistake. It was a fraud. It doesn't matter that he signed the assignment. You cannot obtain successor liability simply because he was lying. Your claim is for unjust enrichment under the two alternative theories. I cannot make Tony and his companies, the successor, no matter how many times he lies without the continuity of ownership because he was never a shareholder of Demucci Development Corporation of Lynchburg. He was never a director. He was never an officer. I don't care what he signs. You can't have successor liability. That is why of your two alternative theories, Judge Winkler said, notwithstanding what he said, and I understand why you plotted, he said, because I didn't know what was going to happen at trial. Maybe the judge was going to say, you're stopped from denying it. If you sign enough papers, I'm going to deem you to be an officer. I'm going to deem you to be a shareholder regardless. That was why he said, you've got to proceed on the unjust enrichment. I knew I couldn't win two judgments. Okay. Since the court allowed you to proceed and found for your client under this theory of unjust enrichment, why isn't there properly a set-off? There isn't a set-off for a slew of reasons. Number one, Demucci Realty Co., the party to the signed agreement, made advances to Mr. Blonstein. Anthony Demucci had no interest in that company ever. He claimed the amount of money that he was awarded is based on, we'll use the term, the other corporation's benefit of these leases that were formed because of his claim, Mr. Blonstein, that he helped develop those leases. Isn't that essentially it? There were draws paid during the term advanced by Demucci Realty while it was working during the period that the agreement was in effect. That is correct. And weren't these agreements formed or the basis of them formed in that period of 1996 to 1997 when he worked for Sal Demucci? Yes. And at that time he received certain advances over and above the work that he had done, true? No. It was advances, everything but the over and above part. That's correct. There were advances while it was working there, 1996 and 1997. So if his claims arise out of the work that he did during this period from 1996 to 1997, I don't understand why there wouldn't be an allowable set-off for those commissions that he was advanced that he hadn't earned. I'll give two separate answers. Number one, the right to the advances belongs to Demucci Realty. That company is never under, was never under Tony's control, was under sales control, went to his wife. Yvonne Demucci's counsel is here. That claim belongs to her. Anthony doesn't get to sit. This claim, though, this claim for unjust enrichment, clearly arises out of the work that was done for Demucci Realty. You can't say on the one hand that the work, the commissions or the advances had nothing to do with the work for these other corporations when the whole claim is based on work that he did for Demucci Realty. Although, I still want to get to my second answer, but to answer that comment that the court made. This is a case of unjust enrichment by the defendant. It's got nothing to do with the amount of money by which Tony Demucci was unjustly enriched. He was unjustly enriched by X. Whether or not there's an advance that Yvonne Demucci and her counsel collect from Blonstein or not doesn't affect what he was unjustly enriched by. That's the measure of damages, and I cited the cases for it. It's the unjust enrichment by that party. But I want to answer it not just on a legal level. I want to answer it on also a fairness level because, you know, we're lawyers, judges, we want to also do what's correct. We submitted Defendant's Exhibit 12 to the court. That was admitted into evidence. After Tony Demucci grabbed the debt of the account receivable, we'll call it, of Demucci Realty, owed by Blonstein to Demucci Realty, without Yvonne Demucci's consent, without Demucci Realty's assignment, which the court found that wasn't there. He 1099'd Mr. Blonstein for the advances. In other words, what happened in advance was turned into taxable income, and so as a result, when we went to the hearing and said, okay, let's assume we're going to have to address these advances that were made. What's the actual amount that's actually owed that was encouraging the term of the agreement, which is what the court's original query was? Well, if you look at Exhibit 12, you can figure out that it's approximately, and I did the math in the brief. I can't do it in my head. It was approximately $38,000 because they 1099'd him $193,000, of which he then, of course, had to pay taxes on 1099, and the rest of the amount of money related to periods that had nothing to do with while the agreement was in effect, to which Judge Winkler said, is that not only have you proved an assignment by the very documents, Anthony, that you created from the Demucci companies, even if I was to assume that Yvonne Demucci said, here, collect this debt on my behalf, we can't even figure out what the amount is because you converted it during the next couple of years to taxable income. Plus, a lot of it doesn't relate when the agreement was in effect. Didn't Mr. Blonstein, in his deposition, basically admit that he was a broker? No, he did not admit he was a broker, and this also relates to the comment that the court made at the end of the argument by opposing counsel. First of all, there was no defense play of illegality at the trial liability. No defense. When we went to the hearing on damages, third-party defense had said, we want to raise the defense of legality. I filed a motion to strike, and he said, hold it. That defense relates to the underlying liability. It doesn't relate to what's the amount of damages that should be recovered, and the judge granted the motion to strike. That's the motion to strike. That's the order that was not appealed from. They never argued in the original brief. Oh, by the way. Put aside the illegality, that there's a claim that the damages here basically came out of nowhere. The court looked at some tax returns, and if he was indeed a broker, wouldn't that be then the damages really should have been measured as to just a pure commission. Okay, now I understand. I went off on a side track. Regarding the issue of damages and being a broker, no, Mr. Blonstein was not a broker. He would be comparable to calling a lawyer a paralegal. He was working as a developer in this deal. He was the head of real estate development. The expert, although that's giving him more credit than what's due, even the expert of the defendants, third-party defendants, Mr. Ackerman testified that a director of new development is compensated differently than a broker. There's no dispute on that point. Couldn't he be both? Couldn't he be both? Both a developer and a broker? I would say that in the general sense the answer is obviously somebody would be a broker. How would Tennessee authorities look at him? Excuse me? How would the Tennessee authorities look at him in this particular case? The Tennessee authorities would say Mr. Blonstein. If they were going to look at him. If they were going to look at him, they would say, Mr. Blonstein, you did a wise move. You hired Larry Armour to act as your broker there. That is indicia. That is proof that, in fact, you are not just a man of words. You are a man of action. You don't just say that you're not a broker. You hire a broker. We're very pleased that our citizen, our broker. Did he, did Ron Blonstein hire this guy in Tennessee? Yes, and Kathy Evans corroborated that. But in order for Mr. Blonstein to broker the deal in another state, the only way he could do that is if he had a license in that other state. He wasn't a broker. I understand, but as Justice Cable said, he could have been both in terms of what he actually did. Right. Let's assume that he was showing open houses and touring properties, what I would consider to be like regular broker duties. Let's say he hadn't hired Larry Armour. He went to the MLS listings for Chattanooga, Tennessee, and he did all the brokerage work. I think that that would be a valid point. But Mr. Blonstein wasn't acting as the broker. That's why Larry Armour was hired. Okay. So the damage is, and this is not just a friction. It could also be interpreted, though, as that they would split the commission. No, because Mr. Blonstein was promised 10% equity interest under his deal. We know from the affidavit of Anthony that he said, I have personal knowledge of all transactions involving any DeMucci entity and was involved in every decision concerning the purchase, sale, lease, or development of any properties in which the DeMucci family entities had an interest. And, again, from Paragraph 3, although my brother Salvatore was the president of DeMucci Realty, our business has always been a family business, and all decisions and information about real estate deals, whether buying, selling, developing, leasing, were jointly made by my brother Salome. Tony knew exactly what Michael Blonstein's deal was. Yeah. He cut this guy out. He stole the deals. He deprived the widow of it, and now he's sitting here with three deals that all cashed out, all developed by Blonstein with Kathy Evans while he was still there, and he's saying, come catch me, and I'm just going to keep making a new entity after new entity, and I'll just keep transferring it. And 12 years later, if you're still alive, if you're still around, if I have it one-on-one by half a dozen motions to dismiss or motions for summary judgment, then maybe we'll see what happens. But until then, you're not going to get a dime out of it. This is unjust enrichment. He is receiving the 10% that he knew that Michael Blonstein was entitled to receive. He's being unjustly enriched. I'm not asking for the 90%. I've netted everything out, all the expenses, all the debt. I took a look at the cases. This is DX72, which is attached to the brief. Those damage tables were excruciatingly difficult to create. I had to find Robert Miller, who was experienced in drugstore valuations. This is precisely what he was unjustly enriched by. I'm not begrudging him. If he wants 90% of the deal, fine. If there's an issue with the widow and whether it's 45%, 45% because it should have been a sales deal, that's not a problem. But how does Blonstein end up with the short end of the stick? These are all cash cows. We're in the worst economic times of our lives. But CBS is a Fortune 100 company. Twenty-year leases with five-year options, et cetera, et cetera. This is a Fortune 100 company that always pays its rent. These deals were golden based on these leases. That's why they were gift horses. And that's why the judge entered the ruling in favor of plaintiffs, third-party plaintiffs. Okay. I think we understand your position, counsel. I will simply close because I don't know if there's time. Do you have any other questions? Okay. Mr. Vukovich, you have the final word. Mr. Rosenstein, I'm only going to talk about damages for the most part. Talks about this 10% equity interest in the deal. Well, that's back to the contract. Now, we're the only party, if the trial court said the contract does not apply, we're the party saying that if the contract doesn't apply, then the contract terms don't apply. So now they've come in with an unjust enrichment claim saying there's no contract, and yet their liability claim and their damage claim is based on the contract. You cannot have it both ways. That 10% interest, the idea of a 10% interest is solely based upon an agreement, an agreement between Mr. Blonstein and Demucci Realty Ltd. So it cannot apply if we're going to have a theory of unjust enrichment. However, if you're going to go back to the contract and say, well, okay, 10%, then that 10%, the right to 10%, is predicated on a few things. Number one, it's predicated upon putting a capital contribution in before you get your 10%. Now, Mr. Blonstein testified unequivocally that he never put that 10% in. In fact, he went so far as to say, I never had the money. I did not have the money. And so you have a person who had no money to pay the 10%, and not only did he not have the money, he owed by his own admission either $300,000, $268,000, or $104,000. He never did what he was supposed to do to get a 10% if you're going to apply that term. The second thing is to get that 10%, you have to present those deals in writing to presumably Sal Demucci. And you have to do it within 30 days of finding the deal. So that's what I would call a condition precedent. That was the obligation of Mr. Blonstein to prove at trial. When I asked him when he did this presentation, I don't know. I don't know. We do know he came up with a piece of paper in April 1997 that says, oh, it's my intention to do these deals. Well, that's like a letter of intent. Until you do what you're supposed to do, pay your capital contribution, and present the deals in writing within the requisite time, you're out of business. The other thing is he quit. He quit in June 1996, and that agreement says once that agreement is terminated, no 10%. So there was nothing that allowed him to get that 10% by the terms of the contract. And I've got to go back to one thing, this idea that somehow the third-party defendants did something wrong to get the deals. The idea of abandonment is a perfectly acceptable legal principle. Well, unjust enrichment doesn't presume any wrongdoing either, does it? It requires wrongdoing according to the HPI case, according to the McKay case. I thought it was the benefit that's being reaped. Your Honor, as I read those cases, they say specifically there must be some fraud, undue influence, or duress. We don't have that here. Now, if Mr. Blonstein thought that third-party defendants stole those transactions from the widow, then they could have very well called the widow, so to speak, to testify. In fact, the widow's lawyer is here. The widow's lawyer was in the trial court. Nobody, nobody testified those transactions were stolen. The only people who testified was the lawyer who said affirmatively, uncontradicted, no finding that it wasn't credible, that Yvonne DiMucci did not want to do those deals, she did not want to sign personal guarantees, she did not want to get involved in the complicated things that occur when you do real estate transactions. Unequivocal abandonment. So to the extent that that we need to focus on what happened, the unrefuted testimony is abandoned. Thank you. Counselors, thank you both. The case will be taken under advisement.